UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| YAPHET MARTIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 2:13-CV-00048-SPM |
| | ) |
| JAMES HURLEY, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Yaphet Martin ("Plaintiff"), currently an inmate at Tipton Correctional Center in Tipton, Missouri, brought this action under 42 U.S.C. § 1983 to redress violations of his constitutional rights allegedly sustained at two other prisons, Northeast Correctional Center ("NECC") and Southeast Correctional Center ("SECC"). Currently before the Court is the Motion for Summary Judgment filed by Defendants James Hurley, Robert Sherman, Leslie Carsey, Clifton Cossey, Steven Buhs, Cheryl Thompson and Ian Wallace (collectively, "Defendants"). (Doc. 80). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (Doc. 16). For the following reasons, the Court will grant Defendants' motion.

I. **FACTUAL BACKGROUND**[1]

In May of 2012, a visitor tried to smuggle narcotics into NECC. An investigation showed that Plaintiff's personal identification number had been used to call individuals involved in the

---

[1] These facts are taken from the parties' statements of undisputed material facts and the affidavits and declarations submitted by the parties. Pursuant to 28 U.S.C. § 1746, Plaintiff's unsworn declaration carries the same force or effect as a "sworn declaration, verification, certificate, statement, oath, or affidavit." Any disputed facts are viewed in the light most favorable to Plaintiff as the non-movant.

smuggling incident. On July 26, 2012, Defendant Leslie Carsey, an Investigator at NECC, issued Plaintiff a Conduct Violation Report ("CVR") related to the smuggling incident for a violation of Missouri Department of Corrections Rule 11.02, "Possession or Use of an Intoxicating Substance."

On August 2, 2012, Plaintiff had a hearing in front of a disciplinary board that included Defendant Robert Sherman, a Functional Unit Manager at NECC. Plaintiff attempted to provide the board with a signed statement from another inmate, Kenneth Jackson, that would have exculpated him, but the board refused to accept the statement or put it into Plaintiff's file. The board ultimately found Plaintiff guilty of a conduct violation for his Rule 11.02 infraction. Defendant Sherman recommended that Plaintiff receive an initial 30-day placement in disciplinary segregation, a year of no contact visits, and a referral to the administrative segregation committee. Plaintiff was released from his 30-day stint in disciplinary segregation on September 1, 2012 and was immediately transferred from NECC (a low-security prison) to SECC (a high-security prison), where he was again placed into administrative segregation.

In the general population at NECC, Plaintiff routinely went outside, used exercise equipment, participated in prison games, took vitamins, ate warm meals, bought food from the prison store, socialized with other inmates, had contact visits with family and friends, and had general access to medical care. In disciplinary and administrative segregation, he was confined to a small room for practically the entire day and sometimes was not allowed to leave it for up to three days. His recreation time was limited to one hour, three times a week, spent in a ten-foot by five-foot cage. He was denied contact visits with family and friends (though he had non-contact visits) and was denied the opportunity to talk with most inmates. His food was generally served cold, and he was denied access to vitamins. The lights in his room were constantly on at some

level, though they were dimmed for five hours at night. He had reduced shower privileges (every three days instead of daily); reduced access to laundry (clean clothes once a week instead of daily); limited access to library materials; no access to television; waiting periods before receiving medical treatment; no ability to arrange a marriage ceremony to a civilian; no ability to participate in religious and secular classes; and limited ability to purchase items from the canteen.

The administrative segregation committee at SECC gave Plaintiff hearings on September 6, 2012, October 3, 2012, November 1, 2012, January 24, 2013, April 16, 2013, and May 30, 2013 to determine whether he would remain in administrative segregation. At each hearing prior to May 30, 2013, the committee extended Plaintiff's confinement in administrative segregation due to the nature of his original Rule 11.02 violation. Defendants Clifton Cossey (a Case Manager II at SECC), Cheryl Thompson (a Functional Unit Manager at SECC), and Steven Buhs (a Case Manager II at SECC) each attended several of Plaintiff's hearings. On at least one occasion at SECC, Plaintiff attempted to provide the administrative segregation committee with Kenneth Jackson's exculpatory statement at these hearings, but the committee refused to accept it. While in administrative segregation, Plaintiff filed (and ultimately prevailed upon) a grievance disputing the sufficiency of the original CVR issued to him by Defendant Carsey.

On May 30, 2013, the administrative segregation committee decided to release Plaintiff into the general inmate population. On June 4, 2013, the day before Plaintiff was released into general population, Defendant Thompson requested that visiting and telephone restrictions be imposed on Plaintiff due to his multiple drug-related violations and history of substance abuse, including a prior violation for a positive drug test and an admission that he was high on drugs when he committed the offenses that led to his incarceration. Defendant Ian Wallace, the warden

at SECC, endorsed Defendant Thompson's request for telephone and visiting restrictions. On June 5, 2013, Plaintiff was released into the general inmate population at SECC. In total, Plaintiff spent 308 days in segregation: 30 days in disciplinary segregation at NECC, and 278 days in administrative segregation at SECC.

Plaintiff asserts in his declaration that his prison sentence was "significantly extended" as a result of being found guilty of the conduct violation at issue in this case. However, according to an uncontroverted affidavit from Plaintiff's probation and parole officer, John Wessig, neither Plaintiff's sentence nor his parole release date were extended due to his conduct violation in late 2012 or his subsequent assignment to administrative segregation. Mr. Wessig stated that Plaintiff's parole release date (May 18, 2017) was set in May 2014 and was rescinded in May 2015 based on poor institutional conduct. Plaintiff is now scheduled to serve his full sentence (through November 18, 2017).

## II. PROCEDURAL BACKGROUND

Plaintiff initiated this § 1983 action by filing a *pro se* complaint on May 29, 2013. United States District Judge Audrey G. Fleissig initially dismissed Plaintiff's complaint pursuant to 28 U.S.C. § 1915(e) for failure to state a claim, but she then vacated that order *sua sponte* and determined that the suit could proceed beyond the frivolity review stage. Plaintiff was subsequently appointed counsel, and Plaintiff filed his Second Amended Complaint on December 9, 2014. Defendants filed the instant Motion for Summary Judgment on April 14, 2015.

## III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *Avon State Bank v. BancInsure, Inc.*, 787 F.3d 952, 956 (8th Cir. 2015). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.* at 324. "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (internal quotations omitted). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

## IV. DISCUSSION

Plaintiff asserts three counts in his Second Amended Complaint, each under 42 U.S.C. § 1983. In Count I, he alleges that Defendants Carsey, Hurley, and Sherman violated his due process rights in connection with the original conduct violation issued at NECC. In Count II, Plaintiff alleges that Defendants Thompson, Cossey, Buhs, and Wallace denied him due process by failing to provide meaningful review of his continued confinement in administrative segregation at SECC. In Count III, Plaintiff alleges that Defendants Thompson and Wallace violated his First and Fourteenth Amendment rights by placing telephone and visitation restrictions on him in retaliation for his filing and prevailing on his prisoner grievance. Plaintiff has sued each Defendant in his or her individual capacity. Defendants have moved for summary

judgment on all counts, arguing that they did not violate Plaintiff's rights and that they are entitled to qualified immunity.

"'Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.'" *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To promote the second interest, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Court uses a two-pronged test to resolve qualified immunity issues. First, "a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232 (internal citations omitted). Second, "the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* (quotation marks and citations omitted). If either prong is not satisfied, qualified immunity applies. *Id.* The Court is free to address the two prongs in either order. *Id.* at 236.

**A. Defendants Are Entitled to Summary Judgment on Plaintiff's Due Process Claims (Counts I and II)**

In Counts I and II, Plaintiff alleges violations of his rights under the Due Process Clause of the Fourteenth Amendment. Defendants assert that they are entitled to summary judgment because there are no genuine issues of material fact and, as a matter of law, they did not violate

Plaintiff's rights under the Due Process Clause. Defendants also argue that they are entitled to summary judgment based on the doctrine of qualified immunity.

"In order to prevail on a Fourteenth Amendment due process claim, [Plaintiff] must first demonstrate that he was deprived of life, liberty or property by government action." *Phillips v. Norris*, 320 F.3d 844, 846 (8th Cir. 2003). The Supreme Court has held that prisoners have a liberty interest, protected by the Due Process clause, in avoiding conditions of confinement that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Thus, to assert a violation of due process rights based on a liberty interest in avoiding confinement to administrative segregation, "an inmate must show that the segregation created an 'atypical and significant hardship on him in relation to the ordinary incidents of prison life' to demonstrate that his liberty interest was curtailed." *Rahman X v. Morgan*, 300 F.3d 970, 973 (8th Cir. 2002) (quoting *Sandin*, 515 U.S. at 484). The question of whether an atypical and significant hardship exists is a question of fact. *Portley-El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002). However, as discussed below, the Eighth Circuit frequently finds as a matter of law that no atypical and significant hardship exists.

The Eighth Circuit has repeatedly held that an assignment to disciplinary or administrative segregation is not, in itself, an atypical and significant hardship that triggers due process protections. *See Phillips,* 320 F.3d at 847; *Portley-El*, 288 F.3d at 1065. However, the Eighth Circuit has held that a particularly lengthy confinement to administrative segregation may constitute an atypical and significant hardship that implicates a liberty interest. *Williams v. Norris*, 277 F. App'x 647, 648-49, 2008 WL 2003319, at *1 (8th Cir. 2008) (almost twelve years in administrative segregation constituted atypical and significant hardship). In addition to duration, the specific conditions imposed in administrative segregation are relevant to the

7

determination of whether there is an atypical and significant hardship. *See Phillips*, 320 F.3d at 847 (considering whether particular limitations on contact visitation, exercise privileges, and chapel rights placed on a prisoner in segregation constituted an atypical and significant hardship, and concluding they did not); *cf. Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005) (considering both conditions and duration of inmates' assignment to a state's supermax prison in finding that the inmates had a liberty interest in avoiding assignment to that prison).

Thus, in evaluating Defendants' motion, the Court must determine whether Defendants have established that, as a matter of law, confining Plaintiff to administrative segregation for 308 days, under the conditions asserted in Plaintiff's declaration, did not constitute an "atypical and significant hardship in relation to the ordinary incidents of prison life." The Court concludes that Defendants have done so.

First, as Defendants point out, the Eighth Circuit has held that confinement to disciplinary and/or administrative segregation, for time periods similar to (and even exceeding) the 308-day period at issue here, do not constitute an atypical and significant hardship that triggers due process protections. In *Hemphill v. Delo*, the Eighth Circuit considered an inmate's claim that he did not receive due process before being confined to segregation for a period of 324 days (four days in a locked housing unit, 30 days in disciplinary segregation, and 290 days in administrative segregation). 124 F.3d 208, 1997 WL 581079, at *2 (8th Cir. 1997) (unpublished). The court affirmed summary judgment in favor of the defendants, finding that "without alleging more, this period of time in segregation does not constitute an 'atypical and significant hardship' when compared to the burdens of ordinary prison life." *Id.* (citing *Freitas v. Ault,* 109 F.3d 1335, 1338 (8th Cir. 1997)). More recently, in *Orr v. Larkins*, the Eighth Circuit considered an inmate's claim that he was deprived of liberty without due process when he was

8

placed in administrative segregation for nine months. 610 F.3d 1032, 1033 (8th Cir. 2010). Relying in part on *Hemphill*, the Court found that the plaintiff had not been deprived of a liberty interest and affirmed the dismissal of the plaintiff's complaint. *Id*. at 1034-35. *Hemphill* and *Orr* clearly establish that the fact that Plaintiff was confined to disciplinary and/or administrative segregation for 308 days, standing alone, is insufficient to show that he faced an atypical and significant hardship that triggered his due process rights.

Plaintiff argues that unlike the plaintiffs in *Hemphill* and *Orr*, he has identified numerous specific conditions in segregation that imposed hardships on him, including a reduction in his recreation time from 49 to three hours per week; inability to leave his cell for up to three days at a time; inability to participate in religious and secular classes; limited ability to purchase items from the canteen; no contact visits; limited access to telephone, showering, laundry, and library materials; no access to television; 24-hour lighting of his cell (dimmed only for a few hours at night); delays in receiving medical care; and inability to arrange a marriage ceremony to a civilian. Plaintiff is correct that particularly onerous conditions, in combination with lengthy duration, may constitute an atypical and significant hardship. *See Wilkinson*, 545 U.S. at 223-24 (2005) (considering both conditions and duration of more restrictive confinement). However, Plaintiff cites no cases suggesting that conditions such as those he faced in administrative segregation, alone or in combination, create an atypical and significant hardship in relation to the ordinary incidents of prison life. Indeed, conditions similar to most of the conditions identified by Plaintiff have previously been held, as a matter of law, *not* to constitute such a hardship. *See Phillips*, 320 F.3d at 847 (no atypical and significant hardship where a prisoner was in segregation for 37 days without contact visitation, exercise, or access to religious services; noting that "[a] prisoner does not have a liberty interest in contact visitation"); *Rahman X*, 300

F.3d at 973-74 (8th Cir. 2002) (no atypical and significant hardship where segregation lasted 26 months, the prisoner was allowed out of his cell for recreation for three hours per week (like other death row inmates), and the prisoner could not watch television in his cell); *Freitas*, 109 F.3d at 1337-38 (no atypical and significant hardship where prisoner was subjected to 30 days of limited visitors and no phone privileges, followed by an additional period of several months in which he was limited in his ability to keep personal items in his cell, was required to be in his cell more often, and was limited his movements within the prison); *Kennedy v. Blankenship*, 100 F.3d 640, 642 & n.2 (8th Cir. 1996) (no atypical and significant hardship where prisoner already in administrative segregation was placed in "punitive isolation" for 30 days, which involved a cessation of the privilege of working and the accompanying good time credits; housing in a two- or four-man cell instead of a two-man cell; and restrictions on mail, telephone, visiting, commissary, and personal possession privileges); *Wilson v. Harper*, 949 F. Supp. 714, 721-23 (S.D. Iowa 1996) (no atypical and significant hardship where prisoner spent eleven months in restricted confinement involving fewer yard privileges, limited personal phone calls, and personal property restrictions); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (cited in *Phillips*, 320 F.3d at 847) (finding no atypical and significant hardship where inmates were in administrative segregation for six months and were permitted to leave their cells only three to four times a week; were permitted no outside recreation; did not receive clean clothing, linen, or bedding as often as regulations required; and did not have access to educational or religious services).

The Court acknowledges that in *Wilkinson*, 545 U.S. 209, the Supreme Court found that two of the conditions present here—24-hour lighting of the cell and very limited exercise—contributed to a finding of an atypical and significant hardship. In *Wilkinson*, the Supreme Court

found that Ohio prisoners possessed a liberty interest in avoiding transfer to OSP, a state "supermax" facility, stating:

> For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin,* placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP.

*Wilkinson*, 545 U.S. at 223-24 (internal citations omitted). This case provides some support for Plaintiff's position. However, the present case does not involve several of the key considerations that motivated the Court in *Wilkinson*: a prohibition on almost all human contact, indefinite confinement with only annual review, and disqualification for parole consideration. The conditions here, even when considered in combination, do not rise to the level of the conditions found to create an atypical and significant hardship in *Wilkinson*.

Plaintiff's conclusory assertion that his "prison sentence was significantly extended as a result of being found guilty of the conduct violation at issue in this case," does not change the Court's conclusion. Plaintiff provides no explanation of how, when, or to what extent his sentence was extended. The only other evidence in the record related to the length of Plaintiff's sentence is the affidavit of Plaintiff's parole officer stating that in May 2014 (more than a year after Plaintiff was released from administrative segregation), the parole board set Plaintiff's parole release date as May 18, 2017, and that in March 2015 that parole release date was rescinded due to poor institutional conduct, such that Plaintiff will serve his full sentence through

11

November 18, 2017. This evidence demonstrates that Plaintiff's conduct violation and segregation did not render him ineligible for parole, because his parole date was set long after the segregation ended. At most, it appears that the conduct violation might have been one consideration in the decision about when Plaintiff's parole date would be set or whether it would be rescinded. However, the Supreme Court has found that a finding of misconduct that does not "inevitably" affect the duration of a prisoner's sentence, but is rather just one relevant consideration to decisions about parole, does not implicate a liberty interest. *Sandin*, 515 U.S. at 487. Even assuming, *arguendo*, that Plaintiff's conduct violation played some role in the decision to rescind his parole release date or affected his sentence in some other way, Plaintiff has submitted no evidence that it "inevitably" did so.

For all of the above reasons, the Court concludes that no reasonable jury could find that the 308 days Plaintiff spent in administrative segregation, under the conditions claimed, rise to the level of an "atypical and significant hardship in relation to the ordinary incidents of prison life" as that standard is applied in the Eighth Circuit. Thus, Plaintiff did not have a liberty interest in avoiding the segregation at issue here, Defendants did not violate his due process rights, and Defendants are entitled to summary judgment on Plaintiff's due process claims.

Moreover, even assuming, *arguendo*, that Plaintiff did have a liberty interest in avoiding segregation for 308 days under the combination of conditions at issue here and that Defendants violated his right to due process, Defendants would be entitled to qualified immunity based on the second prong of the qualified immunity analysis. As discussed above, under the second prong of the qualified immunity analysis, the Court must determine whether the right in question was "clearly established at the time of [the defendants'] alleged misconduct." *De Boise*, 760 F.3d at 896 (quoting *Brown*, 574 F.3d at 496). "A defendant cannot be said to have violated a clearly

established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)).

The Court cannot say that any reasonable official in Defendants' position would have understood that Plaintiff's confinement to administrative segregation, under the conditions here, constituted an atypical and significant hardship that would trigger his due process rights. As the above discussion makes apparent, existing precedent certainly has not placed that question "beyond debate." In the Eighth Circuit cases that consider administrative segregation involving time periods and conditions most similar to those here, courts have found no atypical and significant hardship. Plaintiff cites no Eighth Circuit cases finding an atypical and significant hardship under facts similar to those in this case, nor has the Court located any. In light of this case law, the Court cannot say that "any reasonable official" in Defendants' position would have understood that he was violating Plaintiff's rights by confining him to administrative segregation under the conditions at issue here without affording him due process. Accordingly, there was no violation of a "clearly established" right, and Defendants are entitled to qualified immunity on Plaintiff's due process claims.

### B. Defendants Are Entitled to Summary Judgment on Plaintiff's Retaliation Claim (Count III)

In Plaintiff's third count, he claims that Defendants Thompson and Wallace retaliated against him by placing him under phone and visitation restrictions for two years after he was released into general population at SECC. Plaintiff contends that these restrictions were imposed

to punish him for filing and prevailing on a grievance, thereby violating his First and Fourteenth Amendment rights.

In order to establish a prima facie retaliation claim, Plaintiff bears the "heavy evidentiary burden" of proving (1) that he exercised a constitutionally protected right, (2) that Defendants disciplined him, and (3) exercising the right was the motivation for the discipline. *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1119 (8th Cir. 2007) (citations omitted). With regard to the third element, "[m]erely alleging that an act was retaliatory is insufficient." *Id.* (citing *Benson v. Cady*, 761 F.2d 335, 342 (7th Cir. 1985)). Instead, Plaintiff must show that, but for a retaliatory motive, Defendants Thompson and Wallace would not have subjected him to these telephone and visitation restrictions. *Haynes v. Stephenson*, 588 F.3d 1152, 1156 (8th Cir. 2009) (citing *Goff v. Burton*, 7 F.3d 734, 737 (8th Cir. 1993)). To survive summary judgment, Plaintiff must provide affirmative evidence of such a retaliatory motive. *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007) (citing *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006)).

Plaintiff asserts in a conclusory fashion that "the only logical explanation [for the phone and visitation restrictions] is that Defendants were punishing [Plaintiff] for filing a grievance appeal and prevailing on his grievance appeal." *See* Pl.'s Mem. Opp'n, Doc. 86, at 10. However, Plaintiff has no affirmative evidence to support that assertion. As Defendants point out, the only evidence in the record indicates that Defendants Thompson and Wallace had a different, valid reason for requesting the restrictions: Plaintiff's history of substance abuse and his history of multiple drug-related violations. Because Plaintiff points to no affirmative evidence from which a reasonable juror could find that Defendants Thompson and Wallace would not have imposed the phone and visitation restrictions but for his filing and prevailing upon a grievance, Defendants are entitled to summary judgment on Plaintiff's third count.

## V. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 80) is **GRANTED**. The Court will issue a separate judgment consistent with this Memorandum and Order.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 5th day of November, 2015.